<u>NOT FOR PUBLICATION</u>                                    (Document Nos. 129, 133)

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

—————————————————————  :
                                                  :
WOODROW BULLOCK, JR.,                             :
                                                  :     Civil No. 10-1412 (RBK/KMW)
                            Plaintiff,            :
                                                  :
              v.                                  :     **OPINION**
                                                  :
                                                  :
MARIE ANN CABASA, et al.,                         :
                                                  :
                          Defendants.             :
—————————————————————  :

**KUGLER**, United States District Judge:

       This case arises out of the physical restraint and forcible medication of Plaintiff

Woodrow Bullock ("Plaintiff"), an involuntarily committed patient at the Ancora Psychiatric

Hospital ("Ancora").  Plaintiff asserts various claims against Defendants Marie Ann Cabasa, RN,

Lori Gardenhire, RN, SNS,[1] Young Chang, MD, POD, and Raymond E. Fisher, HST

(collectively "Defendants")[2] related to his restraint and forced medication.  Currently before the

Court are Defendants' motions for summary judgment. (Doc. Nos. 129, 133.)[3] For the reasons

expressed below, Defendants' motions will be granted in part and denied in part.

_____

[1] The Court notes that Defendant Gardenhire is referred to as "Gardenshire" on the Docket and in Plaintiff's filings;
however, the Court will refer to her as Gardenhire, as her attorneys do.

[2] The parties stipulated to the dismissal of the claims against Defendant Constance Kellum on April 23, 2014. (Doc.
No. 144.)

[3] Defendant Fisher filed a motion for summary judgment separately from Defendants Cabasa, Chang, and
Gardenhire; however, due to the similarity of claims, the Court will address both motions in this opinion.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[4]

Plaintiff is an involuntarily committed patient at Ancora.  (Defs.' Statement of Undisputed Material Facts ("Defs.' SMF") ¶ 2.)[5]  On April 6, 2008, Plaintiff was restrained by hospital personnel, (Defs.' SMF ¶ 33), and given an intramuscular ("IM") shot of Haldol.  (Ex. C to Defs.' Br. in Supp. of Summ. J. ("Defs' Br."), Deposition Testimony of Marie Ann Cabasa ("Cabasa Dep.") 23:2-8.)  At some point during the process of being restrained, Plaintiff suffered an injury to his ankle that resulted in the need for surgery.  (Pl.'s Supp. Statement of Disputed Material Facts in Opposition to Defs.' SMF ("Pl.'s SMF") ¶ 10.)

At approximately 8:00 p.m. on the date of the incident, Constance Kellum, a Human Services Assistant, was assigned to monitor Plaintiff in a "one-on-one" capacity.  (Ex. C to Def. Fisher's Br. in Supp. of Summ. J. ("Def. Fisher's Br."), Deposition Testimony of Constance Kellum ("Kellum Dep.") 20:9-10.)  She noticed Plaintiff with other people in his room behind the door, and lost observation of him.  (Id. 24:21-25:2.)  When she asked him to come out from behind the door, he became upset.  (Id. 25:4-26:1.)  Kellum asked Defendant Marie Ann Cabasa, the Charge Nurse assigned to Plaintiff's hall, if she could search Plaintiff's room for contraband while Plaintiff was in the shower.  (Cabasa Dep. 12:18-13:9.)  As a result of her search, Kellum found and confiscated two tablespoons of coffee from Plaintiff's room.  (Id.)

Thereafter, Plaintiff called 911.  (Id. 13:9-15.)  Defendants contend that the Plaintiff became "upset/agitated" when staff confiscated his coffee, precipitating his phone call to the

---

[4] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff.  See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

[5] References to "Defs.' SMF," and "Defs.' Br.," and the exhibits therein, refer to papers submitted by Defendants Cabasa, Chang, and Gardenhire. Unless otherwise noted, such references will be applicable to Defendant Fisher. References to papers submitted by Defendant Fisher will be designated by "Def. Fisher's Br.," or "Def. Fisher's SMF." In addition, hereinafter, unless otherwise noted, all citations to Defs.' SMF, etc. incorporate a reference to the corresponding identical paragraph number and admission to that fact found in Plaintiff's response.

police.  (Ex. B to Defs.' Br., Confidential Unusual Incident Report ("CUIR") at NJ 001.)  After the call, Nurse Cabasa told Plaintiff that he was not allowed to call 911 unless it was an emergency.  (Cabasa Dep. 13:16-24.)  Defendants claim that Plaintiff became more upset after this instruction.  (Id. 13:9-14:2.)  Nurse Cabasa tried to calm Plaintiff by telling him that he could talk to someone in the morning about his concerns, and by offering him a quiet room to sit and cool off.  (Def. Fisher's SMF ¶ 3.)

Nurse Cabasa offered Plaintiff a "PRN"[6] dose of Haldol, an antipsychotic medication that can have a calming effect, in pill form, because "[Plaintiff] was pacing, his hands were clenched, pacing; he was very upset because his coffee was confiscated.  He was, I don't know, like mumbling, like trying, he was going to hurt the staff watching him."  (Defs.' SMF ¶¶ 19-21; Cabasa Dep. 16:9-22.)  Plaintiff refused the oral dose of Haldol.  (Defs.' SMF ¶ 23.)  Plaintiff was on a "refusing status," meaning that if he refused his PRN dose of pill medication, an intramuscular dose of the PRN medication would be administered.  (Defs.' SMF ¶ 24; Cabasa Dep. 17:16-18:5.)  Nurse Cabasa told Plaintiff that "if you do not take it by mouth, you are going to have the IM medication." (Id. 20:1-2.)  Plaintiff again refused.  (Id. 20:3-4.)

Plaintiff, on the other hand, contends that he called 911 because, after a nurse, whom he could not identify, asked him to take an oral dose of Haldol and he refused, he saw her with a needle and became afraid that he might be injected with a needle.  (Ex. D to Def. Fisher's Br., Deposition of Woodrow Bullock, Jr. ("Bullock Dep.") 80:17-81:2, 82:8-83:5.)  Plaintiff had already taken his daily dose of Haldol between 7:00 p.m. and 8:00 p.m. that evening.[7]  (Cabasa

---

[6] "PRN" medications refer to medications given on an "as-needed" basis, rather than on a daily basis. (Cabasa Dep. 15:21-24.)

[7] Plaintiff contends that he was justified in refusing to take the PRN dose of Haldol because he had just taken it earlier that evening.  (Pl.'s Supp. SMF ¶ 26.)  In his Supplemental Statement of Disputed Material Facts, he also claims that Haldol has "uncomfortable, even dangerous" side effects such as "serious physical harm, physical debilitation and even death," as well as Neuroleptic Malignant Syndrome and Tardive Dyskinesia.  (Id. 23-25.)

Dep. 15:6-17.)  Plaintiff disputes that he became agitated.  (Bullock Dep. 83:6-8; Pl.'s Opp'n to Def. Fisher's SMF ¶ 4.)[8]  Plaintiff returned to his room after calling 911.  (Def. Fisher's SMF ¶ 21.)

Thereafter, around 10:00 p.m., Defendant Cabasa called a "Code Blue." (Cabasa Dep. 20:16-19, 34:13-19.)  A Code Blue is an emergency call for staff from other wards to come and assist with an agitated patient.  (Id. 20:20-21:14.)  Approximately seven or eight staff members came to assist.  (Id. 21:12-13.)  Plaintiff contends that when he came out of his room, there were a "bunch of guys" standing there, including one who "[looked] like he was going to war with me." (Bullock Dep. 83:18-22.)  Plaintiff told them "I ain't taking no needle." (Id. 84:5-6.)  Plaintiff then "put up [his] guard," meaning that he put his hands up in a boxing position, with closed fists.  (Id. 84:8-17, 91:11-92:9.)  Defendants assert that when staff arrived, Plaintiff was standing with his fists up, saying "I'm going to fuck up whoever is coming close to me." (Id. 24:16-25; Def. Fisher's SMF ¶ 5.)

Plaintiff was then restrained by Defendant Fisher, a Human Services Technician who was covering the one-on-one assignment to monitor the Plaintiff while Kellum was on break.  (Def. Fisher's SMF ¶ 7.)  Defendant Fisher put the Plaintiff in a protective restraint technique ("PRT") because his "main concern was protecting everybody else, and [Plaintiff], from any injuries. Because at that point, he had his hands up in a fighting stance and was threatening everybody."

---

[8] Plaintiff also submits a Certification, dated after close of discovery, that he is no longer taking Haldol and that he feels "much better…on the new medications [Ancora is] giving me." (Ex. K to Pl.'s Opp'n Br. to Defs.' Br.)  This argument, that Haldol is dangerous and should not have been given to the Plaintiff, is not properly before the Court because it was first raised in response to Defendants' motions in the form of legal conclusion.  Plaintiff does not offer any evidence on the record, expert testimony or otherwise, of the effects of Haldol or whether Plaintiff's prescription for Haldol was proper.  See Fed. R. Civ. P. 56(c).

[8] Plaintiff repeatedly references videos capturing Plaintiff's phone call, alleging that the videos show that he was not agitated.  (See, e.g., Pl.'s Supp. SMF ¶ 21; Pl.'s Opp'n Br. to Def. Fisher's Br., 10-11.)  However, these videos are not part of the record, and thus the Court cannot rely on them in accordance with Fed. R. Civ. P. 56(c).

(Ex. B. to Def. Fisher's Br., Deposition of Raymond Fisher ("Fisher Dep.") 41:17-21.)   The PRT involved Fisher standing behind the Plaintiff, putting his arms underneath Plaintiff's arms and raising them up, and placing his hands behind Plaintiff's neck.  (Def. Fisher's SMF ¶ 10.)  The Plaintiff was then secured face-down on the floor, with Fisher on top of him, also face-down.  (Def. Fisher's SMF ¶ ¶ 11(1)-11(2).)[9]  It is unclear exactly how they ended up on the floor.  (Id. ¶ 11(1); Bullock Dep. 85:7-86:3, 122:21-22.)  Plaintiff contends that "somebody" was standing on the back of his foot or ankle; that it could have been Fisher and he thought it was Fisher, but he does not know for sure who was standing on his foot; and that when his stomach hit the floor, he broke his ankle.  (Bullock Dep. 85:22-23, 96:16-97:2, 127:1-128:11.)  Fisher claims that he did not stand on Plaintiff's ankle, nor did he see anyone standing on Plaintiff's ankle. (Fisher Dep. 50:6-12.)

At this point, Cabasa gave the syringe containing the Haldol to an unidentified nurse, who administered the shot.  (Defs.' SMF ¶ 33.)  After being administered the shot, Plaintiff was placed in a "four-point restraint" chair by Fisher and other staff, and cloth restraints were tied at his wrists and ankles.  (Cabasa Dep. 31:6-23; Fisher Dep. 51:1-53:21.)  It is uncertain whether Fisher participated in securing the Plaintiff to the chair with the cloth restraints, although Fisher testified that he does not think that he did.  (Fisher Dep. 51:24-52:3.)  After Plaintiff was secured in the chair, Fisher did not see him again for the rest of his shift, and he does not recall Plaintiff complaining of ankle pain.  (Id. 54:4-55:1.)  Plaintiff was restrained in the chair for a total of two hours and three minutes, being released at approximately 12:05 a.m. on April 7, 2008.  (Defs' SMF ¶ 58.)  Nurse Cabasa checked on Plaintiff every 15 minutes until her shift ended at 11:45

---

[9] Def. Fisher's SMF includes two paragraph number elevens, and this citation refers to both of them.

p.m., during which time Plaintiff did not complain to her about pain in his ankle.  (Defs.' SMF ¶¶ 36-40.)

After Plaintiff had already been restrained, Defendant Dr. Young Chang arrived at the scene in response to the Code Blue.  (Defs.' SMF ¶¶ 46-47.)  Dr. Chang is a psychiatrist within Ancora, and was the Psychiatrist on Duty ("POD") on the date of the incident.  (Id. ¶¶ 43-44.)  Dr. Chang is a trained medical doctor, and had worked as both the Medic on Duty ("MOD") and POD at Ancora in the past.  (Ex. D to Defs.' Br., Deposition of Dr. Young Chang ("Chang Dep.") 6:8-19, 7:6-10.)  However, at the time of the incident, Ancora had two doctors on-site: a POD, and an MOD.  (Id. 6:18-19.)  Dr. Chang contends that his responsibility was to take care of psychiatric issues only.  (Defs.' SMF ¶ 59.)  Dr. Chang authorized the continued restraint of Plaintiff for one hour, from approximately 10:00 p.m. to 11:00 p.m., because, according to Dr. Chang, Plaintiff was "agitated, hostile, threatening staff." (Id. ¶ 51.)  An hour later, Dr. Chang reauthorized the restraint for an additional hour, from approximately 11:00 p.m. to 12:00 a.m., for the same reason.  (Id. ¶ 52.)  Plaintiff did not complain to Dr. Chang of pain in his ankle, nor did Dr. Chang notice any swelling, until approximately 12:05 a.m.  (Id. ¶¶ 49-50, 53-54.)  In response to Plaintiff's complaint of pain, Dr. Chang called the MOD, who evaluated Plaintiff at approximately 12:45 a.m. (Ex. B to Defs.' Br., MOD Response Note at NJ006.)

Nurse Lori Gardenhire also responded to the Code Blue.  (Defs.' SMF ¶ 64.)  When she arrived at the scene, Plaintiff was already on the ground.  (Id.)  Nurse Gardenhire was a supervising nurse who did not perform clinical duties.  (Id. ¶ 62-63.)  She did not participate in restraining the Plaintiff, nor did she administer the IM shot.  (Id. ¶ 65.)  She noted that Plaintiff stated that "he didn't know why he was restrained and that he is OK," (CUIR at NJ002), but she does not recall if she actually spoke to him, or if she received that information from Nurse

Cabasa.  (Ex. M to Pls.' Opp'n to Defs.' Br., Deposition of Lori Gardenhire ("Gardenhire Dep.")

26:3-7; Defs' SMF ¶ 67.)  Nurse Gardenhire's shift ended at 11:45 p.m., at which point she was

not aware of any injury to Plaintiff.  (Gardenhire Dep. 28:25-29:3.)

      Nurse Cabasa returned to work on April 7, 2008 at 3:15 p.m., and was charged with the

responsibility of taking care of Plaintiff.  (Pl.'s Supp. SMF ¶ 4.)  Around 2:00 a.m. on April 7,

2008, Plaintiff had complained of pain in his right leg to another nurse, stating that "I feel like I

have a broken bone." (Ex. B to Defs.' Br., Interdisciplinary Progress Notes ("IPN") at NJ 009.)

Nurse Cabasa did not read the IPN that included this information upon beginning her shift.  (Pl.'s

Supp. SMF ¶ 6.)  However, Nurse Cabasa was told by another nurse that Plaintiff had injured his

ankle, and Plaintiff was also in a wheelchair.  (Cabasa Dep. 37:6-38:5.)  Plaintiff had an X-ray

on April 7, 2008 that revealed a fracture.  (Id. 42:5-10; Ex. H to Pl.'s Opp'n Br. to Defs.' Br.,

Orthopedic Consult Report.)[10]  Nurse Cabasa testified that if a patient had a serious enough

fracture, a doctor or a nurse at Ancora could send the patient to the emergency room, as they did

not have an orthopedist on staff at Ancora.  (Pl.'s Supp. SMF ¶¶ 11-12.)  Despite this, Plaintiff

was not seen for an orthopedic consult at Ancora until April 11, 2008.  (Pl.'s Supp. SMF ¶ 1.)  At

this point, the doctor noted "moderate swelling," and reviewed an X-ray that revealed a fracture.

(Id. ¶¶ 8-9.)  Plaintiff was admitted to Cooper University Hospital, where he underwent surgery

to the affected ankle on April 14, 2008, and was discharged on April 15, 2008.  (Id. ¶ 10.)

      Plaintiff filed suit against Defendants on March 18, 2010, naming Ancora, the State of

New Jersey, and a number of Ancora employees as defendants.  (Doc. No. 1.)  Plaintiff amended

---

[10] Plaintiff points to Exhibit I of his Opposition Brief to Defendant's Brief to support this fact, but Exhibit I refers to an X-ray report with a date of service of 12/24/2008.  Since the Court must construe the facts in the light most favorable to the Plaintiff, the Court notes that Nurse Cabasa testified that Plaintiff received an X-ray on April 7, 2008, and also that the Orthopedic Consult Report references an X-ray that shows "bimalleolar fracture and dislocation with lateral talar shift."

his complaint several times before his Fourth Amended Complaint ("FAC") was filed on March

10, 2013.  (Doc. No. 82.)  The FAC includes Defendants Cabasa, Chang, Gardenhire, Fisher, and

Kellum.  (Id.)  It also includes as Defendants David Gehbauer and Linda Jones,[11] as well as Jane

Doe Nurses 1-15, Jane Doe HSAs 1-15, Jane Doe HSTs 1-15, and John Doe Doctors 1-15.

(Id.).[12]  Against all remaining Defendants, Plaintiff asserts the following claims: (1) 42 U.S.C. §

1983 claim of excessive force and failure to provide medical care in violation of the Fourteenth

Amendment (FAC First Cause of Action ¶¶ 66-71); (2) Violation of the New Jersey Patients'

Bill of Rights, N.J. Stat. Ann. § 30:4-24.2(h) (Id. Second Cause of Action ¶¶ 72-75); (3) Assault

and Battery (Id. Third Cause of Action ¶¶ 76-78); and (4) Negligence (Id. Fourth Cause of

Action ¶¶ 79-81.)[13]

## II.   LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

dispute as to any material fact and that the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine dispute

of material fact exists only if the evidence is such that a reasonable jury could find for the non-

moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court

---

[11] The claims against Gehbauer and Jones were dismissed pursuant to a December 4, 2013 Opinion and Order by this Court. (Doc. Nos. 114 and 115.)

[12] "Although '[u]se of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified,' these parties must be dismissed if such discovery does not reveal their proper identities." Cordial v. Atl. City, No. 11-1457, 2014 WL 1095584, at *3 (D.N.J. Mar. 19, 2014), recons. den., 2014 WL 2451137 (D.N.J. June 2, 2014) (citing Blakeslee v. Clinton Cnty., 336 F. App'x 248, 250 (3d Cir. 2009) (affirming district court's sua sponte dismissal of fictitious parties that were not identified after discovery)).  "This may be done upon motion of a party or the Court." Id. (citing Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.")).  Here, Plaintiff has failed to amend his Complaint or otherwise identify any of these fictitious defendants despite the fact that discovery has now closed.  Thus, these parties shall be dismissed.

[13] A Fifth Cause of Action for Fraudulent Concealment of evidence is alleged as to Defendants Linda Jones, and "other [Ancora] agents, servants and/or employees."  (FAC Fifth Cause of Action ¶¶ 82-87.)  As these Defendants are no longer parties to the action, the Court will not address this cause of action.

weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment. Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996). The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 F. App'x. 353, 354 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the fact finder, not the district court. Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

III.     **DISCUSSION & ANALYSIS**

**A.  FOURTEENTH AMENDMENT CLAIMS**

Plaintiff's first cause of action against Defendants is for excessive force and failure to provide medical care in violation of the Fourteenth Amendment under 42 U.S.C. § 1983.[14]  To recover under § 1983, a plaintiff must show two elements: (1) a person deprived him or caused him to be deprived of a right secured by the Constitution or laws of the United States, and (2) the deprivation was done under color of state law.  See West v. Atkins, 487 U.S. 42, 48 (1988).

**1.  Failure to provide medical care**

The Fourteenth Amendment protects an involuntarily committed patient's right to adequate medical care.  Youngberg v. Romeo, 457 U.S. 307, 324 (1982).  In Youngberg, the Supreme Court expressly rejected the application of the Eighth Amendment's "deliberate indifference" standard to claims by civilly committed patients under the Fourteenth Amendment. Id. at 325.  Instead, the Court adopted the "professional judgment standard," which provides that an official is liable only if a "decision . . . is . . . a substantial departure from accepted professional judgment, practice, or standards."  Id. at 323.  Specifically, the Court considered an involuntarily committed patient's right to safety and freedom from restraint. Id. at 321. Although the Youngberg decision did not address failure to provide medical care specifically, the Court described adequate medical care as one of "the essentials of the care that the State must provide." Id. at 324.

---

[14] While Plaintiff asserts these as one claim in his First Cause of Action, the court will analyze them separately. The Court also notes that Plaintiff seems to allege a violation of his constitutional right to refuse medication in violation of Rennie v. Klein, 720 F.2d 266 (3d Cir. 1983).  (FAC ¶¶ 15, 23.)  Inasmuch as Plaintiff asserts a violation of his Rennie rights, the Court addresses this in Section III(B), infra.

The Third Circuit has recognized that <u>Youngberg</u> "unambiguous[ly] reject[ed] . . . the deliberate indifference standard."[15]  <u>Shaw v. Strackhouse</u>, 920 F.2d 1135, 1148 (3d Cir. 1990); <u>see also</u> <u>Boring v. Kozakiewicz</u>, 833 F.2d 468, 472 (3d Cir. 1987) (In examining a failure to provide medical care claim, stating that "[t]o apply the Eighth Amendment standard to mentally retarded persons would be little short of barbarous.")  The Third Circuit has also found that the professional judgment standard is not equivalent to negligence.  <u>Shaw,</u> 920 F.2d at 1146-47 (citing <u>Daniels v. Williams</u>, 474 U.S. 327 (1986), for the proposition that the professional judgment standard requires a plaintiff to prove more than simple negligence).  According to the Third Circuit, "[p]rofessional judgment, like recklessness and gross negligence, generally falls somewhere between simple negligence and intentional misconduct." <u>Id.</u> at 1146.

The Third Circuit has further explained that the professional judgment standard applies, as its title suggests, only to <u>professionals</u>.  <u>Id.</u> at 1147.  In this context, professionals are "[p]ersons competent, whether by education, training or experience, to make the particular decision at issue."  <u>Youngberg</u>, 457 U.S. at 323 n.30.  "Nonprofessional employees who provide care for institutionalized mentally retarded individuals are subject even after <u>Youngberg</u>, only to a deliberate indifference standard."  <u>Shaw</u>, 920 F.2d at 1147.

Plaintiff claims that Defendants are liable under § 1983 because they failed to provide medical care as required by the Fourteenth Amendment.  (FAC ¶ 69.)  Specifically, Plaintiff

---

[15] The Court notes that, relying on a non-precedential opinion in <u>Rivera v. Marcoantonio</u>, 153 F. App'x. 857, 859 (3d Cir. 2005), some district courts in this circuit have applied the deliberate indifference standard to Fourteenth Amendment claims by civilly committed patients.  <u>See, e.g.</u>, <u>Lewis v. Pearsall</u>, No. 08-786, 2011 U.S. Dist. LEXIS 65742, at *18 ("The Third Circuit has found that Eighth Amendment standards are applicable to a civilly committed patient's claim under the Due Process Clause of the Fourteenth Amendment."); <u>Aruanno v. Caldwell</u>, No. 09-5652, 2011 U.S. Dist. LEXIS 61288, at *19-20 n.5 (D.N.J. June 8, 2011) (excessive force); <u>Artis v. McCann</u>, No. 11-3613, 2013 WL 2481251, at *4, (D.N.J. June 10, 2013) (excessive force).  Following the Third Circuit's precedential ruling in <u>Shaw</u>, this Court applies the professional judgment standard to failure to provide medical care claims, as explained above.  <u>See</u> <u>Shaw</u>, 920 F.2d at 1148.  However, to the extent that these cases discuss excessive force claims, <u>see</u> Section III(A)(2), <u>infra</u>.

contends that Ancora staff waited five days before Plaintiff was seen for an orthopedic consult. (Id. ¶ 34.)

As to Defendants Fisher and Gardenhire, Plaintiff did not complain of pain in their presence, and Plaintiff does not dispute that neither Defendant was responsible for his care in the days following the incident. There was no "substantial departure from professional judgment, practice, or standards," because they were unaware that Plaintiff was injured during their brief interactions with him. Therefore the Court will award summary judgment to Defendants Fisher and Gardenhire for Plaintiff's failure to provide medical care claim.[16]

Defendant Chang did not become aware that Plaintiff had pain in his ankle until approximately 12:05 a.m. on April 7, 2008. At that point, Dr. Chang noticed mild swelling, and called the MOD to evaluate Plaintiff. Plaintiff argues that Dr. Chang was aware of the results of the April 7th X-ray. (Pl.'s Opp'n Br. 26.) He further argues that since Dr. Chang has a medical degree and had at one point acted as both the POD and the MOD at Ancora simultaneously, that he was expected to treat Plaintiff's ankle injury.

Plaintiff's argument fails for two reasons. First, Dr. Chang testified, and Plaintiff produces no evidence to the contrary, that his role as a psychiatrist at Ancora and as the POD on the evening of April 6, 2008 dictates that he was only responsible for psychiatric care. Dr. Chang simply was not responsible for diagnosing and treating Plaintiff's ankle injury. The evidence establishes that Dr. Chang took immediate action when he learned that Plaintiff was injured by calling the MOD, satisfying the requirements of Youngberg by exhibiting professional concern and judgment. See Patten v. Nichols, 274 F.3d 829, 844 (4th Cir. 2001) (finding

---

[16] The Court notes that, even though Defendant Fisher, a human services technician, may not be considered a "professional" as articulated in Youngberg, because Fisher was not responsible for Plaintiff's medical care following the incident and was unaware that Plaintiff was injured, the Court's opinion would not change under the deliberate indifference standard.

summary judgment for defendants appropriate where defendant social worker learned of involuntarily committed mental patient's phone call to her family during which she explained that she was "dying," and displayed signs of trouble breathing, whereupon the social worker reported the call to defendant doctor, who then evaluated the patient by speaking to her for ten minutes in the hallway without ordering any medical tests and determined that the patient required no further treatment). Even if Dr. Chang could have done more to treat Plaintiff's injury besides calling the MOD, the standard articulated in Youngberg requires a "substantial" departure from professional judgment, which is more than simple negligence. Shaw, 920 F.2d at 1146. Moreover, "[t]he Constitution only requires that the courts make certain that professional judgment in fact was exercised. It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." Youngberg, 457 U.S. at 321. Second, Plaintiff has not pointed to any evidence on the record indicating that Dr. Chang had any interaction with Plaintiff in the days following the incident, and thus there is no factual basis to determine that Dr. Chang was responsible for caring for Plaintiff's injuries and failed to do so after he left Plaintiff after midnight on April 7, 2008. The Court will therefore award summary judgment to Defendant Chang for Plaintiff's failure to provide medical treatment claim.

Finally, Plaintiff did not complain of pain in his ankle to Defendant Cabasa before her shift ended on the evening of April 6, 2008. However, Plaintiff alleges that the results of the X-ray taken on April 7, 2008 were known to Nurse Cabasa. (Pl.'s Opp'n Br. 26.) Furthermore, when Nurse Cabasa returned to work the next day, she became aware that Plaintiff had suffered an injury to his ankle as he was in a wheelchair, and another nurse told her that he had suffered an injury to his ankle. Nurse Cabasa's own testimony reveals that a nurse or a doctor could send a patient to the emergency room if he had a serious enough injury. Taken in the light most

favorable to the plaintiff, an inference can be drawn from these facts that Nurse Cabasa was aware of Plaintiff's injury, and she failed to care for him by not sending him to the emergency room for an orthopedic consult prior to April 11, 2008. This raises a question as to whether Nurse Cabasa's conduct was a substantial departure from accepted professional judgment. The Court will deny summary judgment as to Defendant Cabasa for failure to provide medical care in violation of § 1983.

### 2. Excessive Force

The Court adopts a different standard to evaluate claims for excessive force against involuntarily committed mental patients. Although such claims are properly brought by psychiatric patients under the Due Process clause of the Fourteenth Amendment, they may be analyzed under the Eighth Amendment standard used for prisoners.

Plaintiff argues that the proper standard governing Defendants' behavior in his excessive force claim is the professional judgment standard articulated in Youngberg. (Pl.'s Opp'n. Br. 29-30.) As discussed in the previous section, supra, the Supreme Court has held that involuntarily committed mental patients retain liberty interests in safety and freedom from bodily restraint, and that those liberty interests must be evaluated under the professional judgment standard. Id. at 321. Plaintiff urges that "because an involuntarily committed psychiatric patient is confined for treatment rather than incarcerated for the purpose of punishment following conviction, the Eighth Amendment does not apply." Revels v. Vincenz, 382 F.3d 870, 874 (8th Cir. 2004).

Neither the Supreme Court nor the Third Circuit have addressed this precise issue of excessive force in the context of involuntarily committed mental patients. The Eighth Circuit has held that the excessive force claim of a mental patient who was involuntarily committed after having been found not guilty of murder by reason of insanity should be evaluated under the

14

objective reasonableness standard usually applied to excessive force claims brought by pre-trial detainees.  Andrews v. Neer, 253 F.3d 1052, 1061 (8th Cir. 2001).  The First Circuit agrees.  See Davis v. Rennie, 264 F.3d 86, 108 (1st Cir. 2001).  However, the Third Circuit has rejected the objective reasonableness standard for pre-trial detainees because "[w]e can draw no logical or practical distinction between a prison disturbance involving pretrial detainees . . . or sentenced inmates." Fuentes v. Wagner, 206 F.3d 335, 347 (3d Cir. 2000).

It is true that Plaintiff in this case is an involuntarily committed mental patient at a psychiatric hospital, and not a prisoner.  However, as the Supreme Court's logic in Youngberg dictates, Plaintiff is entitled to at least the same protections against excessive force as prisoners. See Artis v. McCann, No. 11-3613, 2013 WL 2481251, at *4 (D.N.J. June 10, 2013); see also Aruanno v. Caldwell, No. 09-5652, 2011 U.S. Dist. LEXIS 61288, at *19 n.5 (D.N.J. June 8, 2011) ("Because Plaintiff is civilly committed, his claim arises under the Due Process Clause of the Fourteenth Amendment . . . However, Eighth Amendment standards are applicable to his claim") (citations omitted).  Thus, for the purpose of this motion for summary judgment, this Court will analyze the excessive force claim separately from the failure to provide medical treatment claim, employing the Eighth Amendment standard.

To prevail on a claim of excessive force in this context, Plaintiff must prove the "unnecessary and wanton infliction of pain," the central inquiry being "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21 (1986).  To make this determination, courts have identified several factors, including "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of the injury inflicted; (4) the extent of the threat to the safety of staff and inmates,

as reasonably perceived by responsible officials on the basis of the facts known to them; and (5) any efforts made to temper the severity of a forceful response." Brooks v. Kyler, 204 F.3d 102, 106 (3d Cir. 2000) (quoting Whitley, 475 U.S. at 321).

Although Defendant Cabasa did not participate in the actual restraint or administering of the IM shot to Plaintiff, it is undisputed that she called the Code Blue and ordered that the shot be given.  Prior to ordering the shot, she attempted to calm the Plaintiff down by speaking with him, offering him time in a quiet room, and offering him an oral dose of Haldol.  Thus Nurse Cabasa contends that she only used the IM shot after all other means of calming the Plaintiff were not successful, showing that she made an effort to temper the severity of her response. (Defs.' Br. 25.)  She also argues that Plaintiff's agitated behavior, including his threats and fighting stance, made the need for force apparent, and the extent of the threat to the safety of staff and patients was such that force was required.  (Id. 24.)  Furthermore, she contends that the force used was "simply an injection," and not the restraint that led to the ankle injury, showing that the amount of force used, and the injury, was minimal.  (Defs' Br. 26.)  Though the extent of injury is a factor, excessive force may be found even where injury is di minimus.  Brooks, 204 F.3d at 108.  More fatal to Nurse Cabasa's motion, Plaintiff testified that he was not agitated, if at all, until after he was surrounded by staff in response to the Code Blue.  If Plaintiff was not agitated, then there could not have been a threat to the safety of the staff and patients that necessitated the application of force.  Taking these facts in the light most favorable to the Plaintiff, there is an issue of fact as to whether any force, let alone the force Nurse Cabasa used in ordering the IM shot, was required.  Thus summary judgment will be denied as to the excessive force claim against Defendant Cabasa.

16

Construing the facts and inferences in the light most favorable to the Plaintiff, the Court holds that an issue of fact exists as to whether Defendant Fisher used excessive force by placing Plaintiff in the PRT during the Code Blue, resulting in his ankle injury.  Though Fisher argues that he put Plaintiff in the PRT in response to Plaintiff threatening people and assuming a fighting stance, and Plaintiff corroborates that his fists were up, still there is an issue of fact as to whether any force, let alone the force used, was necessary.  The Court cannot hold as a matter of law that the extent of the threat to the safety of others as perceived by Fisher necessitated the force used, or that the need for the application of force and the relationship between the need and the amount of force used was appropriate.  Therefore, the Court will deny summary judgment as to the claim for excessive force against Defendant Fisher.

Both Dr. Chang and Nurse Gardenhire arrived in response to the Code Blue after Plaintiff had been restrained and the IM shot administered.  Neither of them ordered the shot or the initial restraint.  Neither of them applied any force whatsoever to Plaintiff.  Because they did not have any personal involvement, arriving only after the alleged wrongdoing took place, summary judgment will be granted for Defendants Gardenhire and Chang on the excessive force claim.

**B.  NEW JERSEY PATIENTS' BILL OF RIGHTS**

Plaintiff asserts a cause of action under the New Jersey Patients' Bill of Rights, N.J. Stat. Ann. § 30:4-24.2(h), alleging that Defendants "participated in the unnecessary or excessive restraint(s), assault and battery of plaintiff, forcible medication and failure to diagnose or treat plaintiff's injuries." (FAC ¶ 72.)  Specifically, Plaintiff alleges that Defendants violated Plaintiff's rights to the following: (1) the least restrictive conditions necessary to achieve the purposes of treatment (§ 30:4-24.2e(2)); (2) privacy and dignity (§ 30:4-24.2e(1)); (3) to be free from unnecessary or excessive medication (§ 30:4-24.2d(1)); (4) to be free from physical

restraint and isolation, except for emergency situations (§ 30:4-24.2d(3)); and (5) to be free from corporal punishment (§ 30:4-24.2d(4)).

Nurse Gardenhire did not participate in the forcible medication or restraint of Plaintiff, nor in his treatment in the days following; as such there is no factual basis to support this claim with respect to her.  The Court will award summary judgment to Defendant Gardenhire on this count.

Defendant Chang also did not participate in the forcible medication or initial restraint of Plaintiff, nor in his treatment in the days following.  However, Dr. Chang did reauthorize the restraint for an additional two hours, which could violate the Plaintiff's right to be free from physical restraint except for emergent situations, as articulated in § 30:4-24.2d(3).  Dr. Chang testified that he kept Plaintiff in the restraint because Plaintiff was agitated and a perceived threat.  Plaintiff does not dispute this contention with expert testimony or otherwise.  Because Plaintiff has offered no evidence that the circumstances did not require him to be restrained for an additional two hours, he has failed to establish the existence of all essential elements to this count on which he bears the burden of proof at trial.  See Celotex, 477 U.S. at 322.  Based on the facts, the Court does not find the other potential violations of the Patients' Bill of Rights that Plaintiff alleges applicable to Dr. Chang.  The Court grants summary judgment for Defendant Chang on this count.

It is undisputed that Defendant Cabasa ordered the IM shot of Haldol.  However, there is no genuine issue of fact as to whether the ordering of the shot violated the Patients' Bill of Rights, specifically to be free from unnecessary or excessive medication.  Plaintiff alleges that Defendants violated Plaintiff's rights to refuse medication as articulated in Rennie v. Klein, 720 F.2d 266 (3d Cir. 1983).  (FAC ¶¶ 15, 23.)  In Rennie, the Third Circuit held that, in light of

Youngberg, supra, "antipsychotic drugs may be constitutionally administered to an involuntarily committed mentally ill patient whenever, in the exercise of professional judgment, such an action is deemed necessary to prevent the patient from endangering himself or others." Id. at 269. Plaintiff himself asserts that "[t]he proper standard for determining whether the State has adequately protected such rights is whether professional judgment, in fact, was exercised." (Pl.'s Opp'n Br. 29-30.)  While Plaintiff points to undisputed evidence that he had taken his daily dose of Haldol shortly before he was offered the oral dose and then injected with the medication, Plaintiff has not produced any evidence as to whether Nurse Cabasa used her professional judgment in deciding to administer the medication.[17] To survive a motion for summary judgment, a Plaintiff must point to sufficient evidence that would allow a jury to return a verdict in his favor, and this Plaintiff has failed to do so.  See Anderson, 477 U.S. at 249.  The Court does not think that the facts support the alleged violations of other sections of the Patients' Bill of Rights against this Defendant.  Therefore, the Court grants summary judgment in favor of Defendant Cabasa for this count.

The Court will deny summary judgment for Defendant Fisher on this cause of action.  An issue of fact exists as to whether Fisher used the least restrictive conditions necessary to achieve the purposes of treatment, namely to administer the IM shot of Haldol, when he placed Plaintiff in the PRT.  In addition, an issue of fact exists as to whether the situation was emergent such that Fisher did not violate Plaintiff's rights by physically restraining him.  Plaintiff disputes that he was agitated and necessitated restraint, and thus a trier of fact could determine that Fisher violated the Patients' Bill of Rights.

---

[17] Plaintiff attempts to prove that Nurse Cabasa violated his Rennie rights by claiming that Plaintiff was justified in refusing the extra dose of Haldol because of the potentially dangerous side effects that it may have on an individual. (Pl.'s Supp. SMF ¶¶ 22-29.)  However, as discussed supra, note 7, this argument is not properly before the court as it was raised in the form of legal conclusion in response to Defendants' motion.  See Fed. R. Civ. P. 56(c).

### C.  ASSAULT AND BATTERY

A common law claim for battery in New Jersey requires "the harmful or offensive touching of plaintiff's person without his consent." Corradetti v. Sanitary Landfill, Inc., 912 F. Supp. 2d 156, 161 (D.N.J. 2012).  Common law assault occurs when a defendant "intends only to cause apprehension" that battery, i.e. harmful or offensive touching, is imminent.  Id.  The plaintiff must thereby actually be put in imminent apprehension.  Leang v. Jersey City Bd. of Educ., 969 A.2d 1097, 1117 (N.J. 2009).  The "intent" requirement is satisfied where an act is done "with knowledge that, to a substantial certainty, [imminent] apprehension will result." Restatement (Second) of Torts § 21 cmt. d (1965).

Defendant Cabasa argues that she cannot be liable to Plaintiff for assault and battery as a matter of law because she neither restrained him nor injected him with the shot of Haldol. (Defs.' Br. 15.)  This Court agrees that, because she did not touch the plaintiff, an essential element of a claim for battery is missing, and she cannot be held liable for battery as a matter of law.  However, Plaintiff appears to make an argument as to Nurse Cabasa's liability for assault, stating that Nurse Cabasa intended to inject Plaintiff and that others were acting at her direction to give him the shot.  (Pls.' Opp'n Br. 24.)  Plaintiff claims that he was placed in "apprehension of a harmful or offensive contact" when he saw Nurse Cabasa "brandishing a hypodermic syringe." (Id. 25.)

Plaintiff's testimony does not reveal that he saw Nurse Cabasa with the needle.  Instead, Plaintiff testified only that he saw a nurse, whom he could not identify by name, holding a needle after he had refused to take the oral dose of Haldol.  But Plaintiff does state that he called the police in response to seeing the needle, suggesting apprehension.  Nurse Cabasa also testified that she gave the needle containing Haldol to another nurse to administer the injection, leading to

the reasonable inference that she was, at one point, holding the needle.  Given Plaintiff's perceived agitation noted by Nurse Cabasa, it can also be inferred that she was substantially certain that this conduct would cause apprehension in the Plaintiff, thus satisfying the intent element of assault.  Viewing these facts and inferences in the light most favorable to the Plaintiff, a reasonable trier of fact could conclude that Nurse Cabasa intended to cause apprehension of harmful or offensive contact in Plaintiff, and thus the Court denies Nurse Cabasa's motion for summary judgment as to the assault and battery claim.

There is no question that Defendant Fisher placed Plaintiff in a PRT, which necessarily involved touching, and that Fisher ended up on the floor on top of Plaintiff.  Fisher appears to make an argument that he lacked the requisite intent for battery, because "it was the actions of the other unidentified staff members who were assisting in the Code Blue that caused both plaintiff and defendant Fisher to fall down to the floor and not Fisher's conscious decision to do so." (Def. Fisher's Br. 14.)  Nonetheless, Fisher intended to put Plaintiff in the PRT.  A reasonable inference is that Plaintiff would find this touching offensive, if not harmful, since he had voiced his objection to being injected.  Therefore, the Court denies Defendant Fisher's motion for summary judgment as to the assault and battery claim.

Neither Defendants Gardenhire nor Chang were involved in Plaintiff's restraint or the administration of the IM shot.  Indeed, Plaintiff states that "it does appear from the record that neither…Chang or Gardenshire…directly participated in the physical take down, forcibly tying Plaintiff to a four-point restraint chair or actual injection." (Pl.'s Opp'n Br. 25.)  Nurse Gardenhire arrived after Plaintiff had already been forced to the floor, and Dr. Chang arrived even later, after Plaintiff had already been restrained in the chair.  Even viewing these facts in the light most favorable to the Plaintiff, a reasonable jury could not conclude that Dr. Chang or

Nurse Gardenhire committed a battery, because there was no touching whatsoever.  Likewise, neither Dr. Chang nor Nurse Gardenhire committed assault because logically there can be no apprehension of an imminent battery when that harmful or offensive touching has already occurred.  Accordingly, the Court will grant Defendants Chang and Gardenhire's motions for summary judgment on Plaintiff's assault and battery claims against them.

### D. NEGLIGENCE

Plaintiff alleges negligence against all Defendants in failing to treat Plaintiff's ankle injury and in giving Plaintiff the IM shot.  (FAC ¶¶ 79-81.)  Under New Jersey law, to succeed on a negligence claim, a plaintiff must establish:  "(1) [a] duty of care, (2) [a] breach of [that] duty, (3) proximate cause, and (4) actual damages."  Polzo v. Cnty. of Essex, 960 A.2d 375, 384 (N.J. 2008).  In an action against a medical professional, the plaintiff has the burden of proving the relevant standard of care governing the defendant, a deviation from that standard, an injury proximately caused by the deviation, and damages suffered from the defendant's negligence. Komlodi v. Picciano, 89 A.3d 1234, 1246 (N.J. 2014).  Generally, the plaintiff needs a qualified expert to establish the relevant standard of care.  Estate of Chin v. St. Barnabas Med. Ctr., 734 A.2d 778, 785 (N.J. 1999).  However, the "common knowledge" exception applies "where jurors' common knowledge as lay persons is sufficient to enable them, using ordinary understanding and experience, to determine a defendant's negligence without the benefit of the specialized knowledge of experts."  Id. (holding that common knowledge exception applied where a dentist extracted the wrong tooth).  "The basic postulate for application of the doctrine… is that the issue of negligence is not related to technical matters peculiarly within the knowledge of medical . . . practitioners."  Sanzari v. Rosenfeld, 167 A.2d 625, 632 (N.J. 1961).[18]

---

[18] In an action for professional negligence, the plaintiff is required to submit an Affidavit of Merit of an appropriate licensed person "that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in

There is no factual basis for the claim against Defendant Gardenhire.  Nurse Gardenhire never clinically examined the Plaintiff, having had only a brief conversation with him in which she did not learn of his ankle injury.  Nurse Gardenhire was a supervising nurse who did not perform clinical duties.  Even if the common knowledge exception applied, a reasonable jury could not conclude that she was negligent in failing to treat the Plaintiff when she did not know of his injury and it was not her duty to provide clinical care.  The Court will grant summary judgment in favor of Defendant Gardenhire for this count.

As it relates to Defendant Chang, the common knowledge exception does not apply because how a psychiatrist diagnoses and treats a fracture is outside the common knowledge of the average juror.  The Court thinks this would be a "technical matter" for a medical professional.  Since Plaintiff has not produced an expert to opine on whether Dr. Chang should have noticed Plaintiff's ankle injury prior to 12:05 a.m., no genuine issue of material fact exists.  However, even if Dr. Chang's actions could be evaluated under the common knowledge exception, there is still no genuine issue of material fact, as no reasonable jury would conclude that Dr. Chang was negligent.  See Jenoff v. Gleason, 521 A.2d 1323 (N.J. Super. Ct. App. Div. 1987) (finding that common knowledge doctrine applied to the method of communicating a radiologist's findings concerning a patient in the hospital).  Dr. Chang was the POD in charge of psychiatric issues only; he did not learn of Plaintiff's ankle injury until Plaintiff complained to him at 12:05 a.m.; when he examined the ankle, he noticed only "mild swelling"; and upon learning of Plaintiff's injury, he called the MOD to give the Plaintiff medical attention.

---

the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices." N.J. Stat. Ann. § 2A:53A-27.  "The plaintiff's failure to provide an affidavit of merit is tantamount to a failure to state a cause of action." Burt v. West Jersey Health Sys., 771 A.2d 683, 687 (N.J. Super. Ct. App. Div. 2001) (citing N.J. Stat. Ann. § 2A:53A-29).  The Court notes that Plaintiff has not submitted such an affidavit.  Nonetheless, the Court will evaluate the merits of the claim, considering whether the common knowledge exception applies to certain Defendants.  Moreover, insofar as the Court grants summary judgment to Defendants, this omission does not bear on the results reached today.

Thereafter, there is no allegation that he continued to care for the Plaintiff.  Thus, Defendant Chang's motion for summary judgment will be granted.

As to Defendant Cabasa, whether or not the circumstances presented gave rise to the need to administer an IM shot are outside the scope of the average juror's common knowledge.  The average juror does not have the requisite training or knowledge to decide if and when a nurse should administer medication to a psychiatric patient such as Plaintiff.  However, as to any alleged negligence for her failure to timely treat Plaintiff's ankle injury, Plaintiff may establish that Nurse Cabasa knew of his fracture and failed to timely send him to the emergency room.  This is a decision which the Court finds may be judged by common knowledge.  See Natale v. Camden County Corr. Facility, 318 F.3d 575, 580 (3d Cir. 2003) (holding that the common knowledge exception applied where a detainee's physician failed to administer insulin to a him for 21 hours, even though the physician knew that detainee was an insulin-dependent diabetic).  Therefore, the Court denies summary judgment as to Defendant Cabasa on this count.

Finally, the Court will deny summary judgment to Defendant Fisher.  Fisher was employed as a "human services technician" during the event in question, and thus is not a medical professional for the purposes of a medical negligence claim.  See N.J. Stat. Ann. § 2A:53A-26.  Fisher has not convinced the Court that no genuine issue of material fact exists as to whether he was negligent when he placed Plaintiff in the PRT.  Specifically, Plaintiff and Defendant Fisher disagree as to whether Fisher stood on Plaintiff's ankle during the PRT, thus breaching his duty of care and proximately leading to his ankle injury.  This is a matter for the jury to decide.  The Court will deny summary judgment as to Defendant Fisher for this cause of action.

**IV.     CONCLUSION**

For the reasons stated above, the Court will grant in part and deny in part Defendants'

motion.  An appropriate order shall issue today.


Dated:  10/14/2014                                          s/ Robert B. Kugler
                                                            ROBERT B. KUGLER
                                                            United States District Judge

25